# Supreme Court of Texas

No. 25-0461

In re ACE American Insurance Company; Endurance American Specialty Insurance Company; GuideOne National Insurance Company; Certain Underwriters at Lloyd's, London and Company Market, Subscribing to Policy No. PTNAM2206330; StarStone Specialty Insurance Company; Starr Specialty Lines Insurance Agency, LLC; and Shelf OPCO Bermuda Ltd. for and on behalf of Fidelis Insurance Bermuda, Ltd.,

*Relators*

On Petition for Writ of Mandamus

**Argued February 10, 2026**

JUSTICE LEHRMANN delivered the opinion of the Court.

Appraisal clauses in insurance policies "provide a means to resolve disputes about the amount of loss for a covered claim." *In re Universal Underwriters of Tex. Ins. Co.*, 345 S.W.3d 404, 407 (Tex. 2011). In this mandamus proceeding involving an insured's claim under a property-insurance policy, we are asked whether the trial court abused its discretion in denying the insurers' motion to compel appraisal under the policy's appraisal provision. The insured resists appraisal, largely on the ground that the underlying dispute is about coverage, not the

"amount of loss." While we do not rule out the existence of coverage disputes, the record amply demonstrates that the parties' disagreements are at least in part about the amount of loss. At this stage of the proceedings, we see no basis on which to prohibit an appraisal in the first instance. We therefore grant relief.

## I. Background

Insured owns, leases, and manages commercial properties nationwide.[1] During the relevant time period (March 1, 2022, to March 1, 2023), Insurers collectively insured those properties via various commercial-property policies.[2] The insured property at issue here is a food-distribution warehouse in Dallas.

On June 12, 2022, a water line that supplied the warehouse's fire-suppression system ruptured below the building's concrete slab, causing considerable damage. Insured timely notified Insurers of the claim. Insurers retained an independent adjuster to investigate the claim, though Insured maintains that the adjuster's involvement has

---

[1] The parties use "Insured" to collectively describe three related entities—Teachers Insurance and Annuity Association of America, Nuveen Alternatives Advisors, LLC, and USCIF Pinnacle Building B LLC—all of which are defendants in the underlying suit and real parties in interest here. We will do the same.

[2] Insurers include ACE American Insurance Company; Endurance American Specialty Insurance Company; GuideOne National Insurance Company; Certain Underwriters at Lloyd's, London and Company Market, Subscribing to Policy No. PTNAM2206330; StarStone Specialty Insurance Company; Starr Specialty Lines Insurance Agency, LLC; and Shelf OPCO Bermuda Ltd. for and on behalf of Fidelis Insurance Bermuda, Ltd. Insurers are all plaintiffs in the underlying proceeding and relators here. We refer to the related insurance policies collectively as the policy.

been "minimal" and that it "made a conscious choice to sit on the sidelines." Insured also asserts that no claim manager visited the site until long after the repair work was completed.

The insurance policy contains an appraisal provision authorizing either party to "make written demand for an appraisal of the loss" in the event that the parties "disagree on the amount of loss."[3] On January 30, 2023, Insurers sent Insured a letter invoking their right of appraisal

---

[3] The provision states in full:

As respects physical loss or damage to covered property, if the [Insurer] and the Insured disagree on the amount of loss, either may make written demand for an appraisal of the loss. As respects any Time Element loss, if the [Insurer] and the Insured disagree on the amount of net income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss.

In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. Each appraiser will state the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss.

Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal:

a. The Insured will still retain its right to bring a legal action against the [Insurer], subject to the provisions of the Legal Action Against The [Insurer] condition; and

b. The [Insurer] will still retain its right to deny the claim.

3

under the policy because, despite "certain undisputed payments" having been made, "the parties are at an impasse with respect to the remaining scope of damage and costs related to the Claim." Insured declined to participate in the appraisal process, asserting it was "premature and unwarranted." The parties then entered into a standstill agreement and engaged in further negotiations but were unable to reach a resolution. Accordingly, on June 14, 2024, Insurers sent a letter "reaffirm[ing] their demand for appraisal." Insured refused.

Insurers then filed suit and moved to compel appraisal, alleging that the parties disagreed on the amount of loss. Specifically, Insurers asserted that they "have paid the Insured all that is owed under the [policy] in connection with the claim" but that "Insured is of the position that additional funds are owed." Insured counterclaimed for breach of contract, Insurance Code violations, bad faith, and a declaratory judgment, alleging among other things that Insurers "refus[e] to pay what they owe," failed to conduct a reasonable investigation, and invoked appraisal to "coerce [Insured] into accepting [a] lowball [settlement] offer." The trial court denied Insurers' motion to compel appraisal. Insurers filed a petition for writ of mandamus in the court of appeals, which denied relief.

## II. Analysis

Appraisal clauses "are uniformly included in most forms of property insurance policies." *State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 888 (Tex. 2009). Such clauses provide a means for insurers and insureds to resolve disputes about the "amount of loss" for a covered claim. *Id.* They are "generally enforceable, absent illegality or waiver."

4

*Universal Underwriters*, 345 S.W.3d at 407. In *Johnson*, we reaffirmed that appraisal is limited to damages and does not extend to determining an insurer's liability under the policy: "[t]he policy directs the appraisers to decide the 'amount of loss,' not to construe the policy or decide whether the insurer should pay." 290 S.W.3d at 890.

Mandamus relief is appropriate to enforce an appraisal clause. *Universal Underwriters*, 345 S.W.3d at 412 (explaining that erroneously denying appraisal "would vitiate the insurer's right to defend [the insured's] breach of contract claim"). However, Insured argues that Insurers are not entitled to an appraisal here for several reasons. First, Insured asserts that the parties' disagreement centers not on the amount of loss but on threshold issues of coverage, causation, and "the very existence" of damage. Second, Insured argues that there is no genuine disagreement about the amount of loss, as is necessary to trigger the right to demand appraisal, because Insurers have yet to clearly state their position on that issue. Finally, Insured contends that Insurers engaged in a pattern of bad-faith, "coverage-avoiding conduct" during the adjustment process, thereby excusing Insured from the obligation to comply with the policy's appraisal provision. We address these arguments in turn.

### A. Scope of Appraisal: Coverage vs. Amount of Loss

We begin with a discussion of *Johnson*, in which we provided guidance on evaluating whether a disagreement between an insurer and an insured falls within the scope of an appraisal clause. *See* 290 S.W.3d at 891–94. In that case, a hailstorm damaged Johnson's roof, and the parties disputed the extent of the damage, with State Farm asserting

5

that only the ridgeline needed repairing at an estimated cost of $500 and Johnson asserting that the entire roof needed replacing at a cost of more than $13,000. *Id.* at 887. Johnson demanded appraisal, but State Farm refused, asserting that the parties' dispute concerned causation and not "amount of loss." *Id.* at 887–88. Johnson sued for a declaratory judgment compelling appraisal. *Id.* The trial court granted summary judgment for State Farm, but the court of appeals reversed and rendered judgment compelling State Farm to participate in the appraisal process. *Id.* at 888, 895. We affirmed, agreeing with the court of appeals that appraisal was required. *Id.* at 895.

In so holding, we reaffirmed that appraisal binds the parties to have the extent or amount of loss determined in a particular way, but the question of liability remains for the courts. *Id.* at 890. The dispute in *Johnson* was not about what caused the property damage—the record indicated nothing other than hail, which the policy covered. *Id.* at 891. Instead, the parties essentially disputed how many shingles were damaged and needed replacing, which was a question for the appraisers because it necessarily affected the replacement cost and, in turn, the amount of loss. *Id.* Similarly, we held that the extent to which damaged property may be repaired or should be replaced is an "amount of loss" question. *Id.* Moreover, we explained, separating loss due to a covered event from a property's preexisting condition is a task for the appraisers. *Id.* at 892–93 (citing *Gulf Ins. Co. v. Pappas*, 73 S.W.2d 145 (Tex. App.—San Antonio 1934, writ ref'd)).

In sum, "[a]ny appraisal necessarily includes some causation element, because setting the 'amount of loss' requires appraisers to

decide between damages for which coverage is claimed from damages caused by everything else." *Id.* at 893. Further, the fact that an appraisal may "turn[] out to involve not just damage but [also] liability questions . . . *does not mean appraisal should be prohibited as an initial matter.*" *Id.* (emphasis added). Accordingly, "unless the 'amount of loss' will never be needed (a difficult prediction when litigation has yet to begin), appraisals should generally go forward without preemptive intervention by the courts." *Id.* at 895. *Johnson* thus demonstrates that a party who seeks to avoid appraisal in the first instance on the ground that the dispute falls outside the scope of the appraisal provision, as Insured does here, must clear a significant hurdle.

Applying those principles, we hold that the parties' dispute is at least in part about the amount of loss and that potential coverage disputes do not defeat a contractual right to appraisal. Insurers do not argue, and the record does not reflect, that the claimed property damage was caused by anything other than the water-main rupture, a covered peril. Instead, Insurers largely contend that Insured spent more than was necessary to return the warehouse to its pre-flood state and is trying to recover those allegedly inflated costs.

For example, Insurers have paid Insured approximately $1.2 million to remediate mold damage, which they contend is the appropriate value of the mold claim, while Insured contends that it is entitled to the policy's full mold sublimit of $10 million. Regardless of who is right, that dispute is over the amount of loss.

Insured asserts that the mold issue implicates coverage because Insurers have taken the position that further payments for mold

7

damage hinge on whether another, unrelated insurance policy also provides mold coverage. That argument fails for two reasons. First, the record indicates that Insurers' position, at least throughout the court proceedings, has been that they value the mold claim at $1.2 million, the amount already paid. In that case, the possibility of additional coverage from other insurers has no bearing on whether Insurers must pay more. Second, any disagreement about allocation of mold losses does not render the "amount of loss" portion of the dispute irrelevant. Once the appraisers value the loss stemming from mold damage, any disputes about allocation of that loss among insurers can be resolved by the court.

Insured also asserts that the parties disagree about whether the mold-remediation work should have been performed on a time-and-materials basis rather than the fixed price provided by the contractor whose bid Insured accepted. We fail to see how that disagreement amounts to a coverage dispute. Ultimately, the parties disagree about the cost of remediating the mold damage caused by the water-main rupture. That is squarely an issue for the appraisers.

Another coverage issue, Insured asserts, is whether increased costs resulting from compliance with Dallas County building codes are covered. However, Insurers do not dispute that the policies cover increased costs due to compliance with local ordinances. Rather, they assert that the building codes were implicated because Insured conducted more extensive repairs than were necessary, triggering additional compliance requirements and costs. Again, the scope of the needed repairs—which would include the costs traceable to compliance with building codes—is an issue for the appraisers. To the extent that

8

discrete disagreements exist regarding coverage for any particular cost of regulatory compliance, we see no reason an appraisal would foreclose a court from resolving those issues. *See Johnson*, 290 S.W.3d at 894 (noting that "in most cases appraisal can be structured in a way that decides the amount of loss without deciding any liability questions").

More broadly, Insured asserts that the parties fundamentally disagree on the scope of the policy's coverage of the "replacement cost" of damaged property and maintains that an appraisal cannot be conducted without a court's addressing what that cost entails. However, just as the parties do not dispute coverage for mold remediation and building-code compliance, they do not dispute coverage for the replacement cost of damaged property. Rather, they dispute whether Insured paid more than was necessary to replace damaged property. Insured may be correct that the crux of the parties' disagreement is over "complex engineering and construction methodologies," but that does not remove the dispute from an appraiser's purview. An appraiser would be well within the "amount of loss" lane in concluding that replacing the damaged property required less expensive techniques and materials than those used by the engineers and contractors Insured hired, as would an appraiser who concludes that those same techniques and materials were necessary. *See Pappas*, 73 S.W.2d at 146 (refusing to set aside an appraisal award where the appraisers concluded that a damaged building could be restored to its original condition by reconstructing some parts of the interior and replacing others, contrary to the insured's position that "complete reconstruction or replacement of the whole interior" was necessary to restore it). And Insured "cannot

9

avoid appraisal at this point merely because there *might* be a causation question that exceeds the scope of appraisal." *Johnson*, 290 S.W.3d at 893 (emphasis added).

Finally, Insured asserts that resolving the dispute will encompass "highly technical engineering and construction issues that appraisers are not appropriately equipped or qualified to address." Insured provides no support for that assertion, which has no bearing on whether the dispute at issue involves coverage rather than the amount of loss. In any event, the appraisal provision contains no exception for disputes that involve complex technical issues.

We need not, and therefore do not, hold that no coverage disputes remain to be resolved.[4] We hold only that any such coverage disputes do not render an appraisal improper in the first instance. Indeed, we said in *Johnson* that even "[w]hen an insurer denies coverage, appraisers can still set the amount of loss in case the insurer turns out to be wrong." *Id.* at 894. Because we cannot say that "the 'amount of loss' will never be needed," we cannot agree with Insured that "preemptive intervention by the courts" is warranted. *Id.* at 895.

## B. Genuine Disagreement About Amount of Loss

Insured next argues that no genuine disagreement between the parties exists as to the amount of loss—as is necessary to trigger a party's right to appraisal—because Insurers' position on that amount

---

[4] Insured also asserts there is a coverage issue regarding its entitlement to lost rent. We need not address that argument because, assuming it has merit, it does not demonstrate that "the 'amount of loss' will never be needed." *Johnson*, 290 S.W.3d at 895.

has been "inconsistent and constantly shifting." As an initial matter, we note that in seeking to compel appraisal in the trial court, Insurers squarely took the position that they "have paid the Insured all that is owed under the [policy] in connection with the claim." They continue to take that position in this Court. To the extent a definitive position on the amount of loss is required, Insurers have provided it.

Even if they had not, Insured cites no authority for the proposition that such a definitive position is needed for the parties to have a genuine disagreement. To "disagree" is, quite simply, "to fail to agree." *Disagree*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). Assuming Insurers' valuation of the claim has changed over time, it is nevertheless abundantly clear that they have consistently viewed the amount of loss as significantly less than Insured does. The appraisal provision requires nothing more.[5]

## C. Prior Material Breach

Finally, Insured argues that Insurers' failure to adjust the claim timely and in good faith, failure to pay amounts owed, and assertions of unfounded coverage defenses amount to prior material breaches of the policy, excusing Insured from complying with the appraisal provision. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one

---

[5] In evaluating whether a party has waived the right to appraisal by unreasonably delaying a demand, reasonableness is measured from the point of "impasse"—the parties' awareness that "further negotiations would be futile." *Universal Underwriters*, 345 S.W.3d at 409. But an impasse is not the same as a disagreement about the amount of loss, which is all that is required for a party to demand appraisal. *Id.* at 408.

party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."). Courts have uniformly rejected similar arguments, and for good reason. *See, e.g., In re Acceptance Indem. Ins. Co.*, 562 S.W.3d 645, 653 (Tex. App.—San Antonio 2018, orig. proceeding); *Michels v. Safeco Ins. Co. of Ind.*, 544 F. App'x 535, 540 (5th Cir. 2013) (applying Texas law), *disapproved of on other grounds by Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 201 (5th Cir. 2016).

First, as noted, we have identified two specific, limited exceptions (illegality and waiver) to the enforcement of an appraisal provision, *Universal Underwriters*, 345 S.W.3d at 407, neither of which is at issue here.[6] Second, as the court of appeals explained in *Acceptance Indemnity*, the "prior breach" argument Insured raises "puts the cart before the horse" because "to sustain this position, we would have to determine in the first instance whether [Insurers] breached the insurance policy." 562 S.W.3d at 653; *see also Michels*, 544 F. App'x at 540 (describing the argument as "incompatible with the mandatory contractual remedy and the strong public policy favoring appraisal clauses"). As we explained in *Johnson*, appraisal is intended to take

---

[6] An appraisal award may be set aside on the back end when there is evidence of fraud, accident, or mistake. *Pappas*, 73 S.W.2d at 146. The courts of appeals have recognized other situations in which the results of an otherwise binding appraisal may be disregarded, including "when the award was made without authority" and "when the award was not in compliance with the requirements of the policy." *Lundstrom v. United Servs. Auto. Ass'n–CIC*, 192 S.W.3d 78, 87 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). We need not address the possible grounds for setting aside an award, as appraisal has not yet occurred.

12

place *before* suit is filed. 290 S.W.3d at 894. If an insured could avoid appraisal by alleging a dispute over coverage or claims handling, "appraisal clauses would be virtually a nullity." *Sanchez v. Prop. & Cas. Ins. Co. of Hartford*, No. CIV. A. H-09-1736, 2010 WL 413687, at *8 n.10 (S.D. Tex. Jan. 27, 2010); *see Johnson*, 290 S.W.3d at 893 (avoiding construction of an appraisal provision "[t]hat would render appraisal clauses largely inoperative").[7]

Accordingly, we hold that an insurer's alleged bad faith in handling a claim does not constitute an exception to the general enforceability of an appraisal clause.

### III. Conclusion

We hold that the trial court clearly abused its discretion in denying appraisal and that Insurers lack an adequate remedy by appeal. We conditionally grant Insurers' petition for writ of mandamus and direct the trial court to grant Insurers' motion to compel appraisal. The writ will issue only if the trial court does not comply.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** May 8, 2026

---

[7] Insured argues that it has done more than merely allege bad faith: it has presented evidence of bad faith. But at this stage of the proceedings, neither breach nor bad faith has been tried or decided.

13